UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZELDA B., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF OAKLAND, et al.,<br><br>    Defendants. | Case No. 21-cv-07078-DMR<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 78 |

Plaintiffs Phyllis A. Thomas and Charles A. Thomas, Sr. along with their adult children and two minor grandchildren filed a civil rights action pursuant to 42 U.S.C. § 1983 claiming Defendants City of Oakland ("Oakland") and LaRichea Smith violated their constitutional rights and the Americans with Disabilities Act during a youth basketball game in February 2020. Defendants now move for summary judgment. [Docket No. 78.] This matter is suitable for determination without oral argument. Civ. L.R. 7-1(b). For the following reasons, the motion is granted in part and denied in part.

I. **BACKGROUND**

    A. **Factual Background**

The following facts are undisputed except where noted. On February 15, 2020, Plaintiffs Phyllis A. Thomas and Charles A. Thomas, Sr. attended a middle school girls' basketball game at McClymonds High School in Oakland, California together with their adult children, Plaintiffs Brian A. Thomas and Racheal D. Colston, and their two minor grandchildren, Plaintiffs Zelda B. and Cynthia M. [Docket Nos. 87 (C. Thomas Decl., Oct. 9, 2022) ¶ 2; 88 (Colston Decl., Oct. 9, 2022) ¶ 2; 89 (Zelda B. Decl., Oct. 9, 2022) ¶ 2; 90 (B. Thomas Decl., Oct. 9, 2022) ¶ 2; 91 (P.

Thomas Decl., Oct. 9, 2022) ¶ 2.]<sup>1 2</sup> The game was part of Oakland's Citywide Youth Basketball League ("the League") and was staffed by Oakland employees, including Defendant Smith, who was the site director for the games played at McClymonds High School that day. [Docket Nos. 78-2 (Morris Decl., Sept. 20, 2022) ¶ 2; 78-3 (Smith Decl., Sept. 19, 2022) ¶¶ 1, 2.] Smith states that as site director, she was "responsible for maintaining safety and order at league games," among other responsibilities. Smith Decl. ¶ 1. Zelda was a player on one of the teams. Zelda B. Decl. ¶ 2.

Frederick Morris is a Sports Coordinator for Oakland. He manages the League, which includes "establishing rules for the operation of the League." Morris Decl. ¶¶ 1, 3. Morris and Smith state that the League has an "established rule" that "fans and/or parents must sit on the opposite side of the gym from the side where teams and coaches sit, unless the gym does not have bleachers on both sides." *Id*. at ¶ 4; Smith Decl. ¶ 5. According to Morris, "[t]his rule is for the safety of the players and to help ensure that spectators do not interfere with the coaches or with the operation of the game." Morris Decl. ¶ 4. The McClymonds High School gym has bleachers with numerous rows of seats on both sides of the court; according to Smith, the seating on each side "is basically a mirror image of the other side." Smith Decl. ¶ 7; Morris Decl. ¶ 5. Each of the four corners of the two sets of bleachers has "a small cut-out section of seating, which is for people with wheelchairs, with signs saying that companions can sit next to the person in the wheelchair." *Id*. at ¶ 7, Ex. A (photos of bleachers). Morris states that the "rule that spectators must sit on the opposite side from the teams and coaches was in effect as of February 15, 2020 at any games played at McClymonds" High School. Morris Decl. ¶ 5.

C. Thomas is 65 years old. He has been a minister and pastor for 25 years. He states that he is physically disabled and that his conditions impair his ability to walk, climb stairs, walk downstairs, and lift his leg. C. Thomas Decl. ¶¶ 3, 5. P. Thomas states that she is physically

---

<sup>1</sup> Because three of the Plaintiffs share the same last name, the court refers to them by their first initials for clarity and concision.

<sup>2</sup> The caption of the complaint states that Zelda B. and Cynthia M. appear by and through their guardians ad litem, Brian A. Thomas and Racheal D. Colston, respectively. Compl. 1. Zelda is B. Thomas's daughter. Cynthia is Colston's daughter. B. Thomas Decl. ¶ 2; Colston Decl. ¶ 2.

1   disabled and that she has mobility problems related to her knees and back. She has difficulty
2   walking and climbing stairs and occasionally uses a cane to walk. P. Thomas ¶ 4. Colston has
3   multiple sclerosis, which affects her balance, causes lower back pain, and impacts her ability to
4   walk. She occasionally uses a cane to walk or "use[s] a wall to walk." Colston Decl. ¶ 4.
5   Plaintiffs are African American, as is Defendant Smith. [*See* Docket No. 64 (2d Am. Compl.,
6   "SAC") ¶ 2.] Smith Decl. ¶ 3.

   On February 15, 202, Plaintiffs entered the gym by walking into the school and down a
hallway. None used a wheelchair or an assistive device to do so. [Docket No. 78-1 (McLaughlin
Decl., Sept. 22, 2022) ¶¶ 3, 4, 6, Exs. A (C. Thomas Dep. at 20, 27), B (Colston Dep. at 16, 19), D
(P. Thomas Dep. at 16, 21).] *See also* Smith Decl. ¶ 8, Ex. B (photo of hallway leading into the
gym).

   C. Thomas arrived by himself before Zelda's game started. He states that one set of
bleachers was "crowded and almost full" and that he would have been required to climb several
rows to find a seat in those bleachers; doing so would "have aggravated [his] hip and caused [him]
pain." C. Thomas Decl. ¶¶ 4, 6. He took a seat in the bottom row of the bleachers on the opposite
side in a section which appeared to be marked for persons with disabilities. According to C.
Thomas, he had attended many basketball and volleyball games at the McClymonds High School
gym and had always sat in the same seating area. *Id*. at ¶ 7. B. Thomas had also arrived early for
Zelda's game and sat or stood near the bleachers with C. Thomas. B. Thomas Decl. ¶ 3; C.
Thomas Decl. ¶ 4.[3] P. Thomas and Colston arrived together later and sat near C. Thomas in the
same section marked as available for persons with disabilities. Both state that the bleachers on the
other side of the gym were "crowded and almost full," and that the front row on the other side was
full. They contend that sitting in the section on the other side of the gym would have required
them to climb several rows up into the bleachers, which both P. Thomas and Colston state that
they are unable to do due to their physical limitations. P. Thomas Decl. ¶¶ 3, 4; Colston Decl. ¶¶

---

[3] B. Thomas states that he "stood on the side next to the bleachers closes to the door of the gym."
B. Thomas Decl. ¶ 3. C. Thomas states that B. Thomas "was also seated in the same section with"
C. Thomas. C. Thomas ¶ 4. Resolution of this discrepancy is not material to the outcome of this
motion.

3

3, 4.

C. Thomas states that after he had been sitting in the bleachers for approximately two hours, Smith approached the group. Both sides agree that Smith then told them to leave the section where they were seated and move to the bleachers on the other side of the gym but they dispute the particulars of the interaction.

C. Thomas testified that Smith said, "[y]ou all have to move over to the other side." He states that Smith approached the group "in a very aggressive manner, and proceeded to berate" C. Thomas, P. Thomas, and Colston, "demanding that [they] leave the section where [they] were seated, and move to another section of the gym." C. Thomas Dep. 44; C. Thomas Decl. ¶ 9. C. Thomas explained that he was not moving because it was "too crowded on the other side" and it would be difficult for him to get into the seats because he was disabled. When he asked why they needed to move, Smith responded, "because I said so" and identified herself as "the Director." C. Thomas Dep. 44-46; C. Thomas Decl. ¶ 10. C. Thomas states that he "explained that [he, P. Thomas, and Colston] each had a physical disability and needed reasonable accommodations to sit there due to [their] disabilities" and that there was no space for them to sit on the front row of the bleachers on the other side. According to C. Thomas, Smith "became even more verbally abusive" and said, "[t]hat's why I say about [the n-word], they don't follow instructions." C. Thomas Decl. ¶¶ 10, 11; C. Thomas Dep. 45-46. Smith continued to "verbal[ly] assault" plaintiffs for approximately 15-20 minutes, including repeatedly using the n-word, and told Plaintiffs that they would not be allowed to attend any games in the future. C. Thomas Decl. ¶¶ 13, 15-17. C. Thomas then left the gym for a brief period of time. C. Thomas Decl. ¶ 18.

P. Thomas testified that near the end of the game, Smith, who was standing near the scorekeeper, started yelling at the group, "[y]ou need to move." P. Thomas Dep. 31. P. Thomas did not know who Smith was talking to at first but then realized she was speaking to them. After Smith "started making her way down towards" the group, P. Thomas departed the gym with Cynthia. *Id*. at 34-35. P. Thomas states that Smith "was extremely loud and appeared to be mentally and emotionally out of control" and testified that she left because she's "not a person who likes confrontation at all." P. Thomas Decl. ¶ 5; P. Thomas Dep. 35. After leaving the gym,

4

1  P. Thomas waited in her car for the game to end.  P. Thomas Dep. 36.  P. Thomas did not have
2  any further interaction with Smith.  *Id*.; Smith Decl. ¶ 15.
3      Colston testified that she heard a loud voice, looked over, and saw Smith near the
4  scorekeeper.  Smith was saying, "Y'all can't sit there.  Y'all got to get up."  Colston Dep. 26.
5  According to Colston, Smith approached the group "talking really loud and becoming irate" and
6  started using the n-word.  *Id*. at 27-28.  Colston testified that C. Thomas was trying to explain to
7  Smith why he could not go to the other side but that Smith was not listening.  *Id*. at 29-30.  At that
8  point, P. Thomas had already left the gym.  Colston testified that she "blacked out" at some point
9  while Smith "got in [her] face" and "berated" her.  *Id*. at 30-31; Colston Decl. ¶ 7.  Colston kept
10 trying to tell Smith, "I have a disability.  I have MS," and that she could not walk to the other set
11 of bleachers due to her pain.  Colston Dep. 31-32.  Smith said, "[t]hat's why I can't stand Black
12 people.  I cannot stand [the n-word].  Ain't nothing wrong with you."  *Id*. at 31-33.  Smith
13 continued to accuse Colston of lying and said that there was "nothing wrong with" Colston.  *Id*. at
14 33.  After Zelda came over and "begged" C. Thomas and Colston to leave, Colston slowly came to
15 her feet and exited the gym.  Zelda B. Decl. ¶ 6; Colston Dep. 33-34.
16     Zelda and B. Thomas state that they heard Smith use the n-word repeatedly, call Colston a
17 bitch, accuse Colston of lying about her disability, and threaten to ban their family members from
18 future games.  Zelda B. Decl. ¶¶ 4, 5; B. Thomas Decl. ¶¶ 5, 6.
19     C. Thomas states that he left the gym to check on his wife in the parking lot.  He came
20 back inside the school to "take a picture of the disabled section logo that was near where" he had
21 been sitting and to "document the incident and the denial of [his] access to the game."  C. Thomas
22 Decl. ¶ 18.  He encountered Smith in the hallway where she "started yelling and cursing at [him]
23 again."  He attempted to photograph her with his cellphone and Smith "attacked [him] and hit [his]
24 hand hard enough to knock the cell phone out of [his] hand."  *Id*.  Colston, B. Thomas, and at least
25 one other family member witnessed this incident in the hallway.  *Id*. at ¶ 19.
26     Smith's version of events is as follows: she states that during the game on February 15,
27 2020, she approached the group sitting in the bleachers, "asked them to please move to the other
28 side of the gym, and explained that the other side is for spectators, and the side they were sitting

5

on was for players and coaches only." Smith Decl. ¶¶ 8, 9. Smith states that everyone moved out of their seats except for C. Thomas and Colston. According to Smith, Colston sat on the bleachers at the floor level and C. Thomas "sat up several rows of bleachers." Smith states that she "allowed the group time to move," and later returned to ask C. Thomas and Colston to move. C. Thomas told her that he was not going to move since "there was no sign posted," and asked her, "[w]ho are you to tell me to get up and move?" Smith states that she explained "that we are not allowed to post anything in the gym" and that she was the site director. *Id*. at ¶¶ 9, 10. Colston told her that C. Thomas "can't climb stairs," even though Smith observed that "he was sitting up several rows in the bleachers," and Smith responded that "there was plenty of space in the bleachers on the other side where he would not have to climb stairs." *Id*. at ¶ 11. Smith states that C. Thomas started yelling at her and she told him that "they could move to the other side, or leave." A referee intervened and eventually escorted C. Thomas and Colston out of the gym. *Id*. at ¶ 12. Smith states that there were many open seats in the bleachers on the spectator side of the gym, including at floor level. *Id*. at ¶ 13.

Smith worked as a site director for Oakland for ten years. She states that during her time in that position, she "uniformly enforced the rule that spectators must sit on the opposite side of the gym from teams and coaches" regardless of race. *Id*. at ¶¶ 1, 6. She also states that she "helped numerous elderly and disabled persons find appropriate seating," and that if a person needed to sit in the lowest level of the bleachers and they were full, she would ask people sitting in the lowest level to move. Smith states that she has "done this multiple times in the past" and that "[i]t is not difficult or complicated." *Id*. at ¶ 14.

### B. Procedural History

Plaintiffs filed the complaint against Oakland, Smith, and OUSD on September 13, 2021 alleging the following claims: 1) a 42 U.S.C. § 1983 claim based on their "rights to be free from excessive force, threats, intimidation or coercion under color of law" against Smith; 2) violation of the Ralph Civil Rights Act, California Civil Code section 51.7, against Smith and OUSD; 3) violation of the Bane Act, California Civil Code section 52.1, against Smith and OUSD; 4) violation of the Unruh Act, California Civil Code sections 51 and 52, against Smith and OUSD; 5)

1   violation of the ADA, 42 U.S.C. § 12101 *et seq.*, against Oakland and OUSD; 6) and negligent

2   infliction of emotional distress against Smith and OUSD.

3         Plaintiffs presented untimely government tort claims to Oakland and OUSD regarding the incident at issue in the complaint. [*See* Docket No. 4 at 4.] On the same date they filed the complaint, they moved pursuant to California Government Code section 946.6 for relief from the government tort claims filing requirements of California Government Code section 945.4. *See id.*; *see* Cal. Gov't Code §§ 945.4 ("no suit for money or damages may be brought against a public entity . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board."); 911.2(a) ("A claim relating to a cause of action for . . . injury to person" must be presented "not later than six months after the accrual of the cause of action."). On January 11, 2022, the court denied the motion on the ground that it lacks authority to grant the relief requested because Section 946.6 petitions must be filed in state court. *Zelda B. v. City of Oakland*, No. 21-CV-07078-DMR, 2022 WL 103548, at *3 (N.D. Cal. Jan. 11, 2022).

      OUSD then moved to dismiss each of the state law claims against it based on Eleventh Amendment immunity and moved to dismiss the ADA claim against OUSD as insufficiently pleaded. Plaintiffs did not oppose the dismissal of the state law claims against OUSD. On February 22, 2022, the court granted OUSD's motion to dismiss. *Zelda B. v. City of Oakland* ("*Zelda II*"), No. 21-CV-07078-DMR, 2022 WL 526160, at *3-5 (N.D. Cal. Feb. 22, 2022). Specifically, the court dismissed the state law claims against OUSD with prejudice; dismissed Plaintiffs B. Thomas, Zelda, and Cynthia's ADA claims with prejudice; and dismissed C. Thomas, P. Thomas, and Colston's ADA claims with leave to amend to plead an agency relationship between Oakland, Smith, and OUSD. *Id.* at *5. The court granted Plaintiffs leave to file an amended complaint by a date certain. Plaintiffs did not file an amended complaint by the deadline and the court entered judgment in OUSD's favor. [Docket No. 52.]

      In April 2022 Plaintiffs filed an amended complaint ("FAC") without leave of court. Defendants Oakland and Smith moved to dismiss the FAC. The parties subsequently filed a stipulation withdrawing the motion to dismiss and permitting Plaintiffs to file a second amended

1    complaint, which the court granted. [Docket No. 63.] The SAC, which is the operative complaint,

2    states two claims for relief: 1) a 42 U.S.C. § 1983 claim for violation of the Fourteenth

3    Amendment's right to equal protection based on race against Smith; and 2) a claim for violation of

4    the ADA, 42 U.S.C. § 12101 *et seq.*, against Oakland.

Defendants Oakland and Smith now move for summary judgment.

## II.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must view the evidence in the light most favorable to the non-moving party. *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248). The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist to support the non-moving party's claims. *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252). A showing that "there is some 'metaphysical doubt' as to the material facts as issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

8

1    is no genuine issue for trial." *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at
2    587).

3    **III.   DISCUSSION**

4           As an initial matter, Defendants move for summary judgment on Plaintiffs' claim for
5    injunctive relief on the ground that they lack Article III standing to pursue injunctive relief
6    because there is no real and immediate threat of future injury. Mot. 14; *see City of Los Angeles v.*
7    *Lyons*, 461 U.S. 95, 111 (1982) (a plaintiff seeking injunctive relief must demonstrate a "real or
8    immediate threat that they will be wronged again—a likelihood of substantial and immediate
9    irreparable injury."). Plaintiffs do not respond to this argument and thus concede the issue.
10   Accordingly, summary judgment is granted as to Plaintiffs' claim for injunctive relief.

11          The court next turns to Plaintiffs' substantive claims for relief.

12       **A.  Equal Protection Claim**

13          Defendants move for summary judgment on Plaintiffs' first claim on the ground that
14   Smith's conduct did not violate the Fourteenth Amendment's Equal Protection Clause. Mot. 9. In
15   the alternative, they argue that Smith is entitled to qualified immunity. *Id*. at 11.

16          "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall
17   'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a
18   direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*
19   *Living Ctr.,* 473 U.S. 432, 439 (1985). To establish a violation of the Equal Protection Clause,
20   Plaintiffs must show that Smith "discriminated against them as members of an identifiable class
21   and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d
22   1130, 1134 (9th Cir. 2003). Thus, at summary judgment, Plaintiffs "must present admissible
23   evidence sufficient to support a finding that [the defendant] treated [them] differently from other
24   similarly situated individuals and that the discrimination was intentional." *See McCollum v.*
25   *California*, 610 F. Supp. 2d 1053, 1057 (N.D. Cal. 2009), *aff'd sub nom. McCollum v. California*
26   *Dep't of Corr. & Rehab.*, 647 F.3d 870 (9th Cir. 2011). While an individual's "use of abusive
27   language" may be evidence of discriminatory intent, "[v]erbal harassment or abuse . . . is not
28   sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Freeman v. Arpaio*, 125

F.3d 732, 738, n.6 (9th Cir. 1997) ("abusive epithets" directed at Muslim inmates did not establish an equal protection violation), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008) (quoting *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)). *See McCollum*, 610 F. Supp. 2d at 1060 (granting summary judgment on equal protection claim based on "derogatory comments" made by officials about plaintiff's Wiccan faith; holding "such statements could be evidence of discriminatory intent" but "the statements themselves are not a deprivation of his constitutional rights.").

Plaintiffs each testified that Smith's behavior and the way she spoke to them was discriminatory. C. Thomas testified that "the way [Smith] asked [him] to move" to the other set of bleachers was "racially motivated," and that "the whole tone of her speech from the beginning of [their] interaction was based on [his] race." C. Thomas Dep. 56. Colston testified that Smith discriminated against her based on her race, stating, "if I was White . . . I don't believe she would have ever done that . . . [s]he wouldn't have attacked us . . . [s]he wouldn't have had been so aggressive or demeaning." Colston Dep. 38. When asked, "[d]o you think if you were White she wouldn't have told you to move to the other side?" Colston responded, "[n]ot the way she said it, and not in the way she did it." *Id.* Similarly, P. Thomas testified that Smith discriminated against her based on her race, stating, "I believe that if I had been a White woman, she would not have treated or even approached me in that manner," and that "she would have been more reserved, and she would have been more respectful to a White person." P. Thomas Dep. 44. P. Thomas also testified that she does not believe that Smith would have told her to move if she was "of a different race." *Id*.

B. Thomas testified that he believed that Smith discriminated against him because of his race based on how she "use[d] certain words . . . her language, her body language . . . how she verbally attacked us, how she discriminated against us just the whole—everything we were saying." B. Thomas Dep. 35.[4] Cynthia testified that Smith discriminated against her because of

---

[4] B. Thomas also responded "no" when asked, "you think her hostility toward you was because you were black?" He testified, "I think because we . . . questioned her, a black man questioning another woman and she probably felt—I can't tell you how she felt, but it seems to me that she had a problem with that." B. Thomas Dep. 35.

10

her race "[b]ecause she said some inappropriate words to" C. Thomas but denied that Smith did anything to Cynthia that was discriminatory. Cynthia Dep. 24-25. Finally, Zelda testified that Smith discriminated against her based on her race, stating, "I feel like if we were white, she wouldn't have even done all of that . . . [c]alling us the N word and stuff like that." Zelda Dep. 28-29. However, she also admitted that Smith never spoke to her. *Id*. at 28.

Defendants note this testimony, Mot. 4-7, and assert that Smith's "rudeness was 'not coupled with any disparate treatment,'" which they argue is dispositive. In support, Defendants rely on *Fennell v. Marion Independent School District*, 804 F.3d 398, 415 (5th Cir. 2015). Mot. 9-10. In *Fennell*, the plaintiffs were three African American students enrolled in a predominantly white school district. They alleged that the school district and two district employees discriminated against them based on their race and created a racially hostile educational environment. 804 F.3d at 402. One of the plaintiffs, Kyana, "had a hairstyle with streaks of burgundy in her hair." A defendant, Davis, told Kyana, "I know how much you people spend on your ethnic hair styles" and asked her "why [she] wanted to bring attention to [her]self." *Id*. at 404. Davis also noted that the district's dress code and athletics policy manual "prohibited students from having their hair in non-naturally occurring colors, including burgundy"; Kyana was aware of this policy. *Id*. Davis told Kyana that she would have to change her hair color before she could resume playing sports and Kyana eventually re-colored her hair. Davis and other school officials "had all admonished other students," including students of other races, that their hair coloring violated school policies and that they would have to cut or re-dye their hair in order to participate in athletic activities. *Id*. This incident formed the basis for an equal protection claim against Davis. *Id*. at 415.

The Fifth Circuit found that Davis's comment "I know how much you people spend on your ethnic hair styles" was "clearly indicative of racial animus." *Id*. However, it held that the comment alone did not establish an equal protection claim, reasoning that it "was not coupled with any disparate treatment":

> the comment must also be coupled with "harassment or some other conduct that deprives the victim of established rights" to constitute an equal protection violation. Here, the evidence of Davis's racial

11

>motivation was not coupled with any disparate treatment. The incident culminated in Davis informing Kyana that she would have to change her hair color before she could continue to participate in school athletic activities. There is no dispute that Kyana's hair color was in violation of the athletic policy, and there is undisputed evidence that Marion ISD officials consistently reprimanded students of all races who violated the hair color policies, requiring those students to change their hair color. Accordingly, despite Davis's racially offensive comment, there is no evidence suggesting that Kyana "received treatment different from that received by similarly situated individuals."

*Id.* (internal citations and footnote omitted).

Here, Defendants cite Smith's statements that she "uniformly enforced the rule that spectators must sit on the opposite side of the gym from teams and coaches" and that she enforced the rule "evenly with people of different races." Mot. 10 (citing Smith Decl. ¶¶ 6, 17). Defendants do not dispute that Smith used abusive and racially offensive language,[5] but instead argue that there is no evidence that she subjected Plaintiffs to disparate treatment based on their race or that any comparator was treated differently. Accordingly, they argue, Plaintiffs' equal protection claims fail under *Fennell*. *Id*.

Plaintiffs respond that Defendants incorrectly posit that "the only way Plaintiffs can prove intentional discrimination is by pointing to a similarly-situated person of another race who was treated more favorably," Opp'n 7, citing statutory employment law cases holding that "[e]vidence that similarly situated employees are treated more favorably is one way to establish intentional discrimination but it is not the only way." *See Marziano v. Cnty. of Marin*, No. C-10-2740 EMC, 2010 WL 3895528, at *7 (N.D. Cal. Oct. 4, 2010) (citing *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 936 (8th Cir. 2006)). Plaintiffs further contend that Smith's conduct "went far beyond speech" and included "menacing behavior, exclusion from a public event, and culminated with a physical assault upon an elderly man," C. Thomas. Opp'n 8. They argue that Smith also "sought to bar the entire family from attending any games in the future." *Id*.

Plaintiffs' statutory employment law citations do not provide the legal standard for constitutional violations and Defendants' reliance on Fifth Circuit law is misplaced. As the Ninth

---

[5] In her declaration, Smith states that "any claim" that she discriminated against Plaintiffs because they are African American is "absurd" and "offensive." Smith Decl. ¶ 17. Tellingly, Smith does not affirmatively deny using the n-word during the incident.

12

1  Circuit recently held in *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022), "a relevant
2  comparator is not an *element* of a disparate treatment claim" under the Equal Protection Clause,
3  and "the existence of a comparator is only *one* way to survive summary judgment on a disparate
4  treatment claim." (emphasis in original; quotation marks and citations omitted)).  "With or without
5  comparator evidence, courts determine whether a government action was motivated by
6  discriminatory purpose by engaging in the 'sensitive inquiry into such circumstantial and direct
7  evidence of intent as may be available.'" *Id*. at 425 (quoting *De La Cruz v. Tormey*, 582 F.2d 45,
8  59 (9th Cir. 1978)).
9      Application of this "sensitive inquiry" requires a deeper dive than what was presented in
10 the briefing as the parties did not address the equal protection claim with respect to each Plaintiff.
11 The court first analyzes the equal protection claims of P. Thomas, Cynthia and Zelda before
12 turning to C. Thomas, Colston, and B. Thomas.

### 1.  P. Thomas, Cynthia, and Zelda's Claims

14     Defendants argue that the equal protection claims by P. Thomas, Cynthia, and Zelda lack
15 merit because none of them engaged in any dialogue with Smith.  Specifically, P. Thomas and
16 Cynthia left the bleachers when P. Thomas realized Smith's yelling "[y]ou need to move" was
17 directed at her and her family.  *See* P. Thomas Dep. 31.  P. Thomas did not have any further
18 interaction with Smith after she left the gym.  *Id*. at 36.  For her part, Cynthia denied that Smith
19 did anything that was discriminatory to Cynthia.  Cynthia M. Dep. 24-25.  There is no evidence in
20 the record that Smith's offensive remarks and use of the n-word was directed at either P. Thomas
21 or Cynthia or that either one heard Smith's offensive remarks or use of the n-word.[6]  As to Zelda,
22 she testified that she observed Smith's use of the n-word with her family but that Smith never
23 spoke to her.  Zelda Dep. 28-29.  Accordingly, Defendants argue that there is no evidence of an
24 equal protection violation with respect to these three Plaintiffs.  Mot. 10.
25     Plaintiffs' opposition does not address Defendants' arguments regarding P. Thomas,

---

[6] Cynthia testified that she did not remember whether she saw or heard Smith say "anything inappropriate" to C. Thomas, but that C. Thomas later told her that Smith had called him the n-word.  Cynthia M. Dep. 25.

13

Cynthia, and Zelda. It appears that the sole basis for their equal protection claims is their assertion that Smith "sought to bar the entire family from attending any games in the future." Opp'n 8. However, there is no evidence that Smith made or communicated such a threat to P. Thomas, Cynthia, or Zelda. The evidence Plaintiffs cite for the claim that Smith "sought to bar the entire family" refer to Smith's statements to C. Thomas, Colston, and B. Thomas only. *See* C. Thomas Decl. ¶ 13; Colston Decl. ¶ 9; B. Thomas Decl. ¶ 5. Accordingly, as P. Thomas, Cynthia, and Zelda have not submitted any evidence that Smith treated them differently based on their race, and Plaintiffs have not offered any authority supporting an equal protection claim based on the undisputed facts about these three Plaintiffs' interactions with Smith, summary judgment is granted on these claims.

### 2. C. Thomas, Colston, and B. Thomas's Claims

Turning to C. Thomas, Colston, and B. Thomas's equal protection claims, Plaintiffs do not address Defendants' argument that Smith demanded that they move to the other set of bleachers because she was enforcing a League rule, and that her enforcement of the rule was neutral and without regard to Plaintiffs' race. There is no record evidence that Smith enforced the rule differently based on a spectator's race. In fact, C. Thomas testified that it is not the fact that Smith asked him to move, but rather it was "the way she asked [him] to move" that was racially motivated. C. Thomas Dep. 56. Similarly, Colston testified that the "way that [Smith] delivered the message [to move]" was discriminatory, not the fact that she told Plaintiffs to move. Colston Dep. 38-40. B. Thomas testified that he thought Smith's asking Plaintiffs to move "seemed like somebody coming to pick a fight" and that he was "not sure" if it was because of his race, but that "how [Smith] responded" to a Black man questioning her was based on race and gender. B. Thomas Dep. 35-37. In other words, Plaintiffs themselves do not believe that Smith's enforcement of the rule was itself racially discriminatory. Plaintiffs offer no evidence challenging the existence of the rule or that Smith enforced it unequally. Accordingly, Plaintiffs have failed to present evidence that would permit a reasonable jury to conclude that Smith's demand that Plaintiffs C. Thomas, Colston, and B. Thomas move to the other set of bleachers constituted disparate treatment for purposes of their equal protection claim.

14

United States District Court
Northern District of California

1      Next, Plaintiffs identify Smith's "menacing behavior" towards them as evidence of
2 disparate treatment. Plaintiffs do not specify what behavior is at issue and do not cite any
3 evidence in support of this claim. Thus, it is not clear whether Smith's purported "menacing
4 behavior" refers to something different than what she said to Plaintiffs and how she said it.
5 Plaintiffs do not cite any authority that Smith's use of abusive and racially offensive language is
6 by itself actionable as an equal protection violation.
7      Plaintiffs next contend that Smith excluded them from a "public event." Opp'n 8. As to
8 B. Thomas, there is no evidence that he was excluded from the game. *See generally* B. Thomas
9 Decl. Accordingly, B. Thomas has not established an equal protection claim based on exclusion
10 from the game.
11     The court reaches a different conclusion as to C. Thomas and Colston. The record contains
12 evidence that Smith demanded that C. Thomas and Colston move to the other set of bleachers. C.
13 Thomas refused, "explain[ing] that [they] had disabilities and needed an accommodation," and
14 Smith "became even more verbally abusive toward them," including accusing Colston of lying
15 and using racial slurs and offensive language. *See* C. Thomas Decl. ¶¶ 9-13, 15. There is no
16 evidence that Smith ordered C. Thomas to leave the gym. Rather, C. Thomas states that he left the
17 gym to check on his wife. *Id*. at ¶ 18. However, when he attempted to re-enter, Smith was in the
18 hallway leading to the gym, "started yelling and cursing at [him] again," and "attacked [him] and
19 hit [his] hand hard enough to knock the cell phone out of [his] hand." *Id*. at ¶ 18. Viewed in the
20 light most favorable to Plaintiffs, a reasonable jury could conclude that Smith barred C. Thomas
21 from re-entering the gym and attending the game. Coupled with undisputed evidence of Smith's
22 discriminatory intent through her use of racially offensive language directed at C. Thomas, a
23 reasonable jury could find that Smith violated the Equal Protection Clause by refusing to allow C.
24 Thomas to re-enter the gym to attend the public event.
25     As to Colston, she states that Smith "stopped the game as she berated" Plaintiffs, and that
26 after C. Thomas left the bleachers, Smith "was standing directly in front of [Colston], yelling into
27 [her] face." Colston Decl. ¶¶ 8, 9. She also states that at some point, the referee moved between
28 Colston and Smith "and another person pulled Defendant Smith away" from her. The referee

15

1 apologized for Smith's behavior and "[t]he referee said [Colston] had to leave or they would

2 forfeit the game." *Id*. at ¶ 13. Based on this evidence, a reasonable jury could conclude that Smith

3 effectively had Colston ejected from the game. As with C. Thomas, a jury could conclude that

4 this evidence, coupled with evidence of Smith's discriminatory intent, demonstrates a violation of

5 the Equal Protection Clause.

6 Finally, Plaintiffs contend that Smith "sought to bar the entire family from attending any

7 games in the future." Opp'n 8. The record contains statements by C. Thomas, Colston, and B.

8 Thomas that Smith told them that they "would not be allowed to attend any games in the future."

9 C. Thomas Decl. ¶ 17; Colston Decl. ¶ 12; B. Thomas Decl. ¶ 17. A reasonable jury could

10 consider this evidence and find that Smith's statement that they were barred from future games,

11 along with evidence of her discriminatory intent, violated the Equal Protection Clause.

12 In sum, Smith is entitled to summary judgment on the equal protection claims brought by

13 Plaintiffs P. Thomas, Cynthia, and Zelda. She is also entitled to summary judgment on C.

14 Thomas, Colston, and B. Thomas's equal protection claims based on her demand that they move

15 to the other set of bleachers and unspecified "menacing behavior," as well as B. Thomas's claim

16 that he was excluded from the game. The motion is denied as to the other bases for the equal

17 protection claims discussed above.

18 Defendants also argue that Smith is entitled to qualified immunity on the ground that there

19 is no precedent "providing notice to public entity employees that being rude, hostile, or

20 insufficiently deferential while interacting with the public could violate the Equal Protection

21 Clause." Mot. 11. However, as discussed above, that is not the basis for C. Thomas, Colston, and

22 B. Thomas's equal protection claims. Rather, their claims are based on Smith's ejection and

23 exclusion of C. Thomas and Colston from the game and her statement that C. Thomas, Colston,

24 and B. Thomas were barred from future games. Defendants do not address these claims or explain

25 how qualified immunity applies to them. Accordingly, they have not shown that Smith is entitled

26 to qualified immunity.

27     **B.**    **ADA Claim**

28 Defendants next move for summary judgment on C. Thomas, P. Thomas, and Colston's

16

1  ADA claims. They note that the ADA claims are based on the following allegations:

2  - Oakland "retained and entrusted Defendant Smith to provide oversight over
3  the basketball game, even though it knew or should have known that Defendant Smith was
4  engaged in unconstitutional and reckless actions, resulting in injuries to participants and
5  attendees at the games."

6  - Oakland "also failed to adequately supervise Defendant Smith, or provide any
7  oversight to prevent the abuse of her authority over the basketball games and therefore
8  ensure the protection of Plaintiffs, elderly attendees and other persons with physical
9  limitations and/or disabilities. [Oakland] has a further duty to discipline its personnel
10 whom it should have known were abusing elderly participants and other persons with
11 physical limitations and/or disabilities. [Oakland] had a duty to exercise reasonable care in
12 the administration of its policies, and by failing to adequately train or discipline its
13 personnel regarding elder abuse, reasonable accommodations for physical disabilities,
14 racial profiling, harassment and violence, it breached that duty.

SAC ¶¶ 26, 27. Defendants argue that this claim is based on an alleged "failure to train, supervise, or discipline" and is subject to the standards applicable to Section 1983 claims for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Mot. 12. *See, e.g., Green v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 909 F. Supp. 2d 1211, 1220 (D. Or. 2012), *aff'd,* 583 F. App'x 832 (9th Cir. 2014) (analogizing an ADA claim for failure-to-train to a failure-to-train claim brought under Section 1983 because the Ninth Circuit has not set out a standard for failure-to-train claims under the ADA). According to Defendants, Plaintiffs do not identify any evidence of "a policy or custom evidencing a deliberate indifference" to Plaintiffs' rights by Oakland decisionmakers, or that such a policy or custom caused their injuries. Mot. 12 (*see Green*, 909 F. Supp. 2d at 1220-21 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989)).

Plaintiffs respond that Title II of the ADA prohibits discrimination by public entities based on failure to accommodate and harassment based on disability. Opp'n 8-9. They assert that C. Thomas, P. Thomas, and Colston each have physical disabilities and sat in a section of the

17

bleachers that they believed was designated for persons with disabilities, and that "[w]hen they requested an accommodation [to remain seated where they were], they were dramatically ousted from the gym and verbally assaulted" by Smith. *Id*. at 9; *see* C. Thomas Decl. ¶¶ 5, 8, 10-12, 14, 15, 18; Colston Decl. ¶¶ 4, 6-8, 10, 13. Plaintiffs argue that this evidence is sufficient to establish liability for violation of the ADA, citing *Thompson v. Davis*, 295 F.3d 890, 895-96 (9th Cir. 2002). Opp'n 9. In *Thompson*, the Ninth Circuit noted that "Title II of the ADA prohibits a public entity from discriminating against a qualified individual with a disability on the basis of disability." *Id.* at 895 (citing 42 U.S.C. § 12132). It held that "[t]o state a claim of disability discrimination under Title II, the plaintiff must allege four elements: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Id.*

On reply, Defendants argue that "Plaintiffs do not address the [ADA] claim that they actually allege," and that summary judgment must be granted on that claim because "[t]here is no evidence of any deficient training, supervision, or discipline that had any causal connection to this incident, nor evidence of deliberate intent by any [Oakland] supervisor or policymaker." Reply 2.

To the extent that Plaintiffs' ADA claim is based in part on Oakland's failure to supervise, discipline, or train Smith with respect to persons with disabilities and reasonable accommodations, summary judgment is granted on the ground that Plaintiffs have not submitted evidence sufficient to demonstrate a dispute of material fact as to Oakland's allegedly inadequate supervision, discipline, or training. However, that is not the sole basis for the ADA claim. While not pleaded with precision, the SAC repeatedly references C. Thomas, P. Thomas, and Colston's allegations that they "needed reasonable accommodations to attend the game," were excluded from and denied access to the facility based on their disabilities, and were "targeted" and "harassed" based on their disabilities. *See* SAC ¶¶ 6, 8, 11, 18. The court previously held that the FAC stated a Title II ADA claim by C. Thomas, P. Thomas, and Colston based on the allegations that they were

persons with physical disabilities; seated themselves in a section of the stands designated for persons with disabilities while attending the game; "were berated by Smith for sitting in the disabled section" even after explaining to her that they each had a physical disability and needed reasonable accommodations to attend the game; and were "excluded from participating in the activity" and "targeted, harassed and denied access to a public facility based on their disabilities." *See Zelda II*, 2022 WL 526160, at *4. The allegations supporting the ADA claim in the operative complaint are identical to those the court examined in the FAC. Plaintiffs have now submitted evidence supporting each of these elements. C. Thomas Decl. ¶¶ 5, 8, 10-12, 14, 15, 18; Colston Decl. ¶¶ 4, 6-8, 10, 13; P. Thomas Decl. ¶ 4.

On reply, Defendants do not dispute Plaintiffs' theory of ADA liability or the evidence supporting the same. Instead, they argue that it is undisputed that if Plaintiffs needed to sit in the first row of the bleachers on the opposite side and it was full, Smith would have accommodated Plaintiffs by requiring other people to move. Reply 5 (citing Smith Decl. ¶ 14). This is beside the point, as there is no record evidence that Smith offered such an accommodation; to the contrary, Plaintiffs state that they told her that they needed accommodations and she responded by accusing them of lying about their disabilities and berating them. Summary judgment on C. Thomas, P. Thomas, and Colston's ADA claims is denied.[7]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted as to the following claims:

- Plaintiffs' claims for injunctive relief;
- the equal protection claims brought by Plaintiffs P. Thomas, Cynthia, and Zelda;
- C. Thomas, Colston, and B. Thomas's equal protection claims based on Smith's demand that they move to the other set of bleachers and unspecified "menacing behavior,"

---

[7] The court notes that Defendants objected to certain documents attached to the Declaration of Pamela Y. Price on the ground that they are "irrelevant and inadmissible." Reply 5. The objection is denied as moot as the court does not rely on these materials in reaching its decision on the motion.

19

- B. Thomas's equal protection claim based on his assertion that he was excluded from the game;
- C. Thomas, P. Thomas, and Colston's ADA claim to the extent that it is based on Oakland's failure to supervise, discipline, or train Smith with respect to persons with disabilities and reasonable accommodations.

The remainder of Defendant's motion is denied. The remaining claims are as follows:

- C. Thomas and Colston's equal protection claims based on their exclusion from the game;
- C. Thomas, Colston, and B. Thomas's equal protection claims based on Smith's statement that they were barred from attending future games; and
- C. Thomas, P. Thomas, and Colston's Title II ADA claims for disability discrimination.

**IT IS SO ORDERED.**

Dated: October 31, 2022



Donna M. Ryu
United States Magistrate Judge